# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 30, 2011 Session

## STATE OF TENNESSEE v. DAVID W. GADDIS

**Direct Appeal from the Criminal Court for Polk County**
**No. 06095     Amy Reedy, Judge**

---

**No. E2011-00003-CCA-R3-CD - Filed June 25, 2012**

---

The defendant was convicted of second-offense driving under the influence, a Class A misdemeanor, and driving with an expired license, a Class B misdemeanor. He was sentenced to eleven months and twenty-nine days, suspended after seven months' incarceration, on the second-offense DUI, and to a concurrent six months on the charge of driving on an expired license, for a total effective sentence of eleven months and twenty-nine days. On appeal, the defendant claims that: the evidence is insufficient to support his convictions; the trial court erred by refusing to allow him to enter evidence pertaining to his tumultuous relationship with a woman; the trial court erred by denying his motion to recuse; the trial court erred by denying his motion to investigate juror dissatisfaction with the verdict; and the sentences imposed were excessive. After carefully reviewing the record and the arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

William J. Brown and David K. Calfee, Cleveland, Tennessee (on appeal); and Randy G. Rogers, Athens, Tennessee (at trial), for the appellant, David W. Gaddis.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Robert Steven Bebb, District Attorney General; and Brooklyn Townsend and Stephen Hatchett, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On August 28th, 2006, the defendant was indicted on one count of second-offense driving under the influence and one count of driving on an expired license. These charges

were the result of a police investigation into an automobile accident that occurred on March 23, 2005, in which the defendant's car was struck by a truck at the intersection of U.S. Highway 64 and State Route 68. The defendant was tried on June 17, 2010, at which time the following evidence was presented:

The State's first witness was Mr. Tony Jones, the driver of the truck that struck the defendant's car. Mr. Jones testified that he and his wife were driving eastbound on U.S. 64 when a car suddenly pulled out in front of them as they neared the intersection of State Route 68. Mr. Jones testified that they crashed into this vehicle. Mr. Jones testified that after the accident, he checked to make sure his wife was uninjured, and then, about three or four minutes later, he walked over to the other vehicle and looked inside. He saw a single occupant, who was seated in the driver's seat but whose body was slumped over into the passenger's seat. Mr. Jones testified that a police officer arrived and took control of the scene before he could render aid. Mr. Jones testified that neither he nor his wife were seriously injured by the accident. Following this testimony, Mr. Jones authenticated several photographs that had been taken of the accident scene and identified his vehicle and the other vehicle involved. These pictures were entered into evidence.

On cross-examination, Mr. Jones testified that he could not identify the defendant as the individual he saw in the other vehicle because that individual was lying down, and as a result, he saw only the individual's side and back. Mr. Jones testified that the person in the vehicle appeared to be unconscious. Mr. Jones testified that he made no attempt to awaken the individual by shaking him or asking him questions. Mr. Jones testified that he could not recall whether the airbags had deployed in the vehicle that he hit or whether there was any blood in the vehicle.

The State's next witness was Deputy Mike Mull with the Polk County Sheriff's Department. Deputy Mull testified that on the night of January 21, 2005, he received a 911 call informing him that there had been a wreck with injuries at the cloverleaf on U.S. Highway 64. He testified that the accident site was located in Polk County and that he responded to the accident scene within a minute of receiving the call.

Deputy Mull testified that when he arrived at the scene and exited his vehicle, he could see a green Toyota Corolla sitting in the westbound lane of U.S. Highway 64 facing east. On the opposite side of the highway (the eastbound side) he saw a Ford pickup truck. Deputy Mull testified that there were two individuals standing outside the truck. After informing him that they were not injured, these individuals suggested that he check on the person inside the Toyota Corolla. Deputy Mull testified that he went to the car, looked inside, and saw a single individual sitting in the car on the driver's side. He testified that this individual was slumped across the center console of the vehicle. Deputy Mull testified that

emergency services personnel responded to the scene and removed the individual from his vehicle. Deputy Mull testified that, after the individual was safely removed, he was finally able to identify the vehicle's occupant as the defendant. Deputy Mull testified that the defendant had severe injuries and that medical personnel on the scene put him in the back of an ambulance and called in a helicopter to fly him to the hospital.

During cross-examination, defense counsel attempted to impeach Deputy Mull's testimony with an EMS evacuation form that stated that the individual removed from the vehicle had been found by the passenger door. However, Deputy Mull insisted that the defendant's Toyota Corolla was a small car and that he had found the defendant with his feet in the driver's side floorboard and his body slumped across the center console, head pointing toward the passenger side door.

The State's next witness was Trooper Larry Fowler with the Tennessee Highway Patrol. Trooper Fowler testified that on January 21, 2005, he was dispatched to work a crash involving two vehicles on U.S. Highway 64 at the intersection of State Route 68. Trooper Fowler testified that when he arrived at the scene of the accident, the defendant had already been transported away. Trooper Fowler testified that he interviewed Mr. and Mrs. Jones at the scene.

Following this testimony, Trooper Fowler identified and described a diagram that he had created of the accident. As described in his testimony, this diagram depicted the defendant's vehicle traveling west on U.S. Highway 64 and then attempting to cross over to the ramp to reach State Route 68, at which time the vehicle was struck by the Jones's truck, which was traveling in the eastbound lane of U.S. Highway 64. Trooper Fowler testified that the defendant's vehicle came to rest in the westbound lane of U.S. Highway 64 and that the Jones's truck came to rest near the on ramp to State Route 68.

After detailing his training and experience in investigating and reconstructing accidents, Trooper Fowler that as a result of his interviews, investigation, and study of the physical evidence at the accident scene he had determined the defendant's vehicle had turned in front the Jones' vehicle, which was traveling eastbound on U.S. Highway 64. He testified that he had concluded from his investigation that the defendant's vehicle was at fault for the collision.

Trooper Fowler testified that as part of his investigation he had determined that the green Toyota Corolla was registered to the defendant. He further testified that when he investigated and inventoried the vehicle, he detected the smell of alcohol. Trooper Fowler testified that based on this information he had subpoenaed the defendant's medical records from the hospital after the accident. The witness was then shown those records. He

authenticated them, and they were entered into evidence. The records included the results of a blood alcohol content ("BAC") test that had been performed by the hospital, the results of which would be discussed by a later witness.

During cross-examination, defense counsel questioned Trooper Fowler about an EMT report stating that the defendant had been found by the passenger side door. Trooper Fowler responded that this notation was not surprising because unrestrained drivers tended to move around inside a vehicle following an impact. Trooper Fowler also testified that it was not unusual for drivers to have injuries to various parts of their bodies when they are involved in an accident and are not wearing a seatbelt. More specifically, Trooper Fowler testified that it was not strange that the defendant had sustained severe injuries to the right side of his body during an accident of this sort, because "often times when you have a direct force into a vehicle the object or objects inside often go toward the vehicle at the time of the collision." Trooper Fowler testified that both airbags on the defendant's vehicle appeared to have deployed during the accident.

Trooper Fowler testified that during his follow-up investigation concerning the accident, he had discovered that the defendant had suffered numerous broken bones, undergone numerous surgeries, and had an extended period of rehabilitation. Trooper Fowler testified that he did not charge the defendant with the offenses at issue until March 23, 2005, in order to give the defendant time to recover. On redirect examination, Trooper Fowler opined that in his expert opinion, in this sort of accident, both of the airbags in a vehicle would deploy even if no passenger was present in the vehicle.

The State's next witness was Ms. Margaret Massengill, a special agent forensic scientist at the Tennessee Bureau of Investigation ("TBI"). Ms. Massengill was qualified as an expert in toxicology and the effects of alcohol on the human body. Ms. Massengill testified that she had received and reviewed a copy of the defendant's medical records from the hospital where he was taken on the night of the accident. Those records contained the results of a blood alcohol content test that had been performed on the defendant. Ms. Massengill testified that based on her study of the defendant's medical records, it was her expert opinion that the defendant's blood alcohol content on the night of the accident was somewhere between .21 and .26. She further testified that this range was considerably higher than .08 grams per milliliter, the legal limit.

Ms. Massengill testified that over the years, numerous studies have been performed studying the effects of driving while under the influence alcohol. She testified that the well-known results of these studies are that alcohol consumption impairs the central nervous system and affects an individual's concentration, motor skills, coordination, and reaction

time. She testified that the consumption of alcohol begins to impair the average person when their blood alcohol content reaches .05 grams per milliliter. She testified that consuming enough alcohol to achieve a BAC above .20 g/ml would unquestionably have a significant affect on an individual's central nervous system.

On cross-examination, Ms. Massengill testified that people who have a BAC of .08 g/ml can perform some simple tasks such as standing in the middle of a room without difficulty. However, with respect to tasks requiring specific motor skills, Ms. Massengill testified that individuals with a .08 g/ml BAC could not carry out simple functions – such as correctly holding a pencil or driving a motor vehicle – without exhibiting pronounced signs of impairment.

Following this testimony, Trooper Fowler returned to the stand. Trooper Fowler testified that on the night of the accident, a deputy gave him the defendant's driver's license at the scene of the wreck. He testified that he looked at the defendant's license and determined that it was expired. Following this testimony, the State rested.

Afterward, the defendant took the stand in his own defense. He testified that he was sixty-one years old and had lived in the Ducktown area his entire life. The defendant acknowledged that he was involved in an accident on January 21, 2005, but testified that he was not alone when the accident occurred.

The defendant testified that his cousin, Carl Simons, had been acting as his designated driver and was behind the wheel at the time of the accident. The defendant testified that he had been in contact with his cousin several times since the accident and that his cousin had attended at least one prior court proceeding. However, the defendant testified that he did not know his cousin's present whereabouts and had no current way to contact him. The defendant testified that he believed that his cousin was in Tampa, Florida, where he moved around frequently working odd jobs involving painting and construction. The defendant also testified that his cousin changed phone numbers frequently and that he did not have his current phone number.

The defendant testified that on the night of the accident, he had a run-in with a girl he had been seeing, Connie Hope, who had caused him difficulties in the past. The defendant testified that prior to the accident he had been out drinking at several different establishments, including Dino's Place and Cheer's, before going to the Runway bar. The defendant testified that he ran into Ms. Hope there and that he left in order to avoid her. The defendant testified that his cousin had driven him back to his house when he suddenly saw headlights behind them. Realizing that Ms. Hope had followed them home, he suggested to his cousin that they go back to the Copper Hill area and get something to eat. He testified

that his cousin agreed and that they were in the course of doing so when they arrived at the intersection where the accident occurred.

The defendant testified that while his cousin was stopped at the intersection, he saw Ms. Hope approaching them from behind. He testified that he could also see the headlights of Mr. Jones's truck approaching the intersection. The last thing that he remembered was feeling his car hit from behind.

The defendant testified that he remembered being taken to a hospital by helicopter. He testified that he had significant injuries, especially on the right side of his body, as a result of the accident. He testified that these injuries included a broken neck, an injury to his right eye, and puncture wounds to his leg and neck on the right side. He testified that he underwent several surgeries following the accident and had several metal apparatuses put into his neck to stabilize it. He testified that he was in the hospital for two or three weeks. He testified that he had no idea what happened to his cousin after the accident because he was unconscious. The defendant also testified that he was unaware that his license had expired but that he was not driving that night in any event. The defendant concluded his direct testimony by stating that he had no idea why his cousin had abandoned him after the accident while he was still lying in the car unconscious.

On cross-examination, the defendant testified that his cousin had never given law-enforcement personnel a statement concerning the accident. The defendant testified that he and his cousin were fairly close and that his cousin knew that he had been charged as a result of the accident and was "in trouble." The defendant conceded that five years was ample time for his cousin to have spoken with the Polk County Sheriff's Office concerning the matter.

The defendant testified that his cousin did not see any blood in the vehicle on the night of the accident and that, after the accident, his cousin went back to the defendant's house and waited for him to return. The defendant testified that his cousin had no reason to suspect that he was not fine following the accident – even though he ended up spending fourteen days in the hospital. When asked why his cousin would not have looked over at the passenger seat to see if he was passed out or unconscious after the wreck, the defendant testified that he "ain't got all the answers, you know." He went on to suggest that his cousin ran away to escape the "crazy person" that rear-ended them. In response to additional questions from the State, the defendant testified that he was a former bail bondsman and was at least somewhat familiar with the criminal justice system. When asked why he had not taken advantage of any opportunity to tell anyone in the criminal justice system that he was not driving on the night in question, the defendant claimed that he thought no one would believe him.

On redirect examination, the defendant testified that it had always been his position that he was never driving the vehicle. On recross-examination, the defendant testified that he told his attorney that he was not driving the vehicle on the night of the accident but that he did not tell anyone else, with the possible exception of some family members. When asked why he would let his friends and the community at large believe that he had been driving on the night of the accident for five and a half years while the charges against him were pending, the defendant testified that he believed that everyone already knew that he was not the driver. The defendant further testified that "[t]oday is the first time I've even had the chance to tell anything" and continued to maintain that he was telling the truth.

Following the defendant's testimony, Richard Amick testified that he had known the defendant for some time. Mr. Amick testified that on the night in question, shortly before he learned that the defendant had been in an accident, he had seen the defendant outside Cheer's in a car that was being driven by the defendant's nephew sometime around 6:00 or 6:30 p.m. Mr. Amick also testified that he had seen Ms. Connie Hope at the establishment earlier in the day. On cross-examination, Mr. Amick testified that it was between 6:30 and 7:00 p.m. that he saw the defendant and that he learned that the defendant had been in an accident around 9:00 p.m.

Following this testimony, the trial court instructed the jury, the parties made closing arguments, and the case was submitted. The jury commenced deliberations at 3:45 p.m., and at approximately 5:30 p.m., the jury submitted three questions to the trial judge. One of these questions was "[i]s there a conflict if a juror states 'if you had known David Gaddis you'd know he always gets a designated driver.'" In the presence of the parties' counsels, the trial judge informed the jury that he could not answer any of their questions. At short time afterward, the jury returned with a verdict of guilty on both counts and assessed fines.

The State's proof at the defendant's sentencing consisted solely of a certified copy of a 2007 conviction for DUI in Polk County. The defendant presented the testimony of his sister, his daughter, and his ex-wife, who generally testified that the defendant was in poor health, that his health conditions worsened when he was in custody, that he was no longer drinking, and that he was currently living a quiet and peaceful life.

The trial court found that a sentence of confinement was necessary to avoid depreciating the seriousness of the offense and because measures less restrictive than confinement had been tried without success. In addition, the trial court expressed concern that the defendant had a serious alcohol problem – as reflected in his prior DUI convictions and his .26 BAC on the night of the accident – about which both he and his relatives seemed to be in denial. The trial court found that confinement would not pose an undue hardship on the defendant in light of the fact that there had been testimony that he was physically capable

of maintaining four gardens and, consequently, it was clear that the defendant was capable of performing strenuous physical activity. The trial court sentenced the defendant to eleven months and twenty nine days, suspended after seven months, on his second-offense DUI and to a concurrent six months for driving with a suspended license.

After passing sentence, the trial court addressed defense motions to interview the jurors and to set aside the jury's verdict. These motions were primarily based on an affidavit that had been filed by one of the jurors following the trial. In this affidavit, the juror stated that he "wish[ed] to withdraw [his] guilty charge [sic] to not guilty." The juror explained that he was fatigued during deliberations, that the other jurors were fatigued as well, and that he and some other jurors had consented to a guilty verdict only because they believed that the defendant would "only be given a fine." The juror added, "I don't believe we were properly instructed to understand the consequences." Defense counsel urged that his evidence, combined with the jury's questions, pointed to possible extrinsic juror contact during deliberations. The State argued that, taken together, these items showed only that one juror may have known the defendant before the trial, and that the jury, although properly instructed, may have made a mistaken assumption concerning the applicable law governing the defendant's sentencing. The State urged that Tennessee Rule of Evidence 606(b) prohibited juror testimony absent some grounds for believing the jury had been exposed to extraneous prejudicial information. The court took the matter under advisement.

The defendant filed a timely motion for new trial. At a hearing on September 24, 2010, and by written order on the same day, the trial court denied the defendant's motions for a new trial, to set aside the jury's verdict, and for leave to allow interview of the jurors. Concerning the latter two motions, the trial court reasoned that the affidavit filed by the juror merely discussed various courses taken during the jury's deliberations and did not indicate that any extraneous prejudicial information had been brought to the jury's attention. Although the question posed by a juror during deliberations concerning another juror's statement regarding the defendant's alleged habit of procuring a designated driver indicated that the jury may have been considering extraneous information, the trial court concluded that this information was beneficial, not prejudicial, to the defendant. The trial court ruled that the evidence before it provided an insufficient basis to launch an investigation into the jury's deliberations. The defendant filed a timely notice of appeal on October 22, 2010.

## ANALYSIS

The defendant raises numerous challenges to his conviction and sentence. He claims that the evidence is insufficient to support his convictions, that the trial court erred by denying his motion to recuse, that the trial court erred by excluding evidence and testimony

concerning the defendant's difficulties with Ms. Connie Hope, that the trial court erred by denying his motion to investigate and set aside the jury's verdict, and that the trial court erred by enhancing his sentence "as a result of the convictions in the present case." After carefully reviewing the record and the arguments of the parties, we conclude that the evidence is sufficient to support the defendant's convictions and discern no error in the trial court's sentencing and other rulings. For the reasons that follow, the judgment of the trial court is affirmed.

## I.

The defendant challenges the sufficiency of the evidence to support his convictions, urging that the State failed to present any evidence that proved beyond a reasonable doubt that the defendant drove the vehicle on the night of the accident. When the sufficiency of the convicting evidence is challenged, the relevant question upon appellate review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011). A "criminal offense may be established exclusively by circumstantial evidence," and "the standard of review [on appeal] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (internal quotation omitted). The resolution of issues such as the credibility of witnesses, the weight and value to be given the evidence, and any factual disputes is properly the province of the trier of fact, and a guilty verdict accredits the testimony of the State's witnesses and resolves all evidentiary conflicts in favor of the theory of the State. *See Sisk*, 343 S.W.3d at 65. The defendant bears the burden of demonstrating that the evidence is insufficient to support a conviction. *Id.*

The defendant in this case stands convicted of violating Tennessee Code Annotated section 55-10-401(a), which provides:

a) It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while:

(1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or

(2) The alcohol concentration in such person's blood or breath is

eight-hundredths of one percent (.08 %) or more.

T.C.A. § 55-10-401 (2005). In addition, the defendant stands convicted of driving with an expired license in violation of a Tennessee Code Annotated 55-50-351(a),[1] which provides in pertinent part:

> A person who drives a motor vehicle within the entire width between the boundary lines of every way publicly maintained that is open to the use of the public for purposes of vehicular travel, or the premises of any shopping center, manufactured housing complex or apartment house complex or any other premises frequented by the public at large at a time when the person's privilege to do so is cancelled, suspended, or revoked commits a Class B misdemeanor.

T.C.A. § 55-50-504(a). The defendant argues that the prosecution failed to prove that he was driving the vehicle on the night in question and consequently that the evidence failed to support his conviction on either count.

Two witnesses, however, testified that the defendant was found in the driver's seat following the accident and that they saw no one else in the vehicle. This testimony provides strong circumstantial evidence that the defendant was behind the wheel of the vehicle before the accident occurred. Although the defendant gave direct testimony to the contrary, the jury was free to discredit this testimony in favor of the circumstantial evidence, and its decision to do so will not be revisited on appeal. *See Sisk*, 343 S.W.3d at 65. The remaining elements of both statutes appear to be amply supported by other evidence that was presented at trial.

## II.

The defendant claims that the trial judge erred by failing to grant his motion to recuse because an appearance of bias was created by the "public embarrassment" to the judge resulting from this court's earlier admonition in a different case involving the same defendant. Whether to "grant a motion for recusal is within the discretion of the trial judge."

---

[1] The State's recitation of the specific statute prohibiting an individual from driving with an expired license that is contained in the defendant's indictment appears to be erroneous, and the trial court's judgment form fails to provide the relevant citation altogether. However, the defendant raised no objection to either defect in the trial court, nor has he challenged either document on appeal. Consequently, any objection concerning defects in either of these forms has been waived.

*Bean v. Bailey*, 280 S.W.3d 798, 805 (Tenn. 2009). A trial judge's decision on a recusal motion will not be reversed on appeal absent a showing that the trial judge committed an abuse of discretion. *See id.* A trial court abuses its discretion only "when the trial court has applied an incorrect legal standard, or has reached a decision which is illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

"A judge should grant a motion to recuse when the judge has any doubt as to his or her ability to preside impartially in the case or when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Smith v. State*, 357 S.W.3d 322, 341 (Tenn. 2011) (internal quotation omitted). A judge's duty to recuse springs from a constitutional source; Article VI, section 11 of the Tennessee Constitution provides that "[n]o Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of which he may be interested . . . ." Our state supreme court has explained that "[t]he purpose of Article 6, § 11 of our Constitution is to insure every litigant the cold neutrality of an impartial court." *Leighton v. Henderson*, 414 S.W.2d 419, 421 (Tenn. 1967). Furthermore, Tennessee Supreme Court Rule 10, Canon 3(E)(1), states: "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer. . . ."

However, it is well established that not every appearance of bias, partiality, or prejudice merits recusal. "To disqualify, prejudice must be of a personal character, directed at the litigant, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case." *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994) (internal quotation omitted). Moreover, "[a]dverse rulings by a trial court are not usually sufficient grounds to establish bias" and "[r]ulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." *Id.* Firm application of these principles require this court to reject the defendant's claim.

The defendant has failed to establish the trial judge's bias or that any bias stems from an extrajudicial source. According to the defendant, the source of the trial judge's alleged bias was an admonition contained in an opinion from this court affirming a separate DUI conviction involving the same defendant. In that case, the defendant challenged his DUI conviction on the grounds that the trial court had made improper comments and had failed to properly admonish a witness for using colorful language while on the stand. In the course of denying his claim, this court stated: "Nonetheless, we find it necessary to admonish the trial court. A bench conference should not have been conducted without defense counsel,

and the trial judge's comments to defense counsel following the bench conference, regarding his stature and girth, were inappropriate, particularly when made in front of the jury." *State v. Gaddis*, No. E2008-00812-CCA-R3-CD, 2008 Tenn. Crim. App. LEXIS 907, at *23 (Tenn. Crim. App. Nov. 20, 2008). The defendant argues that the trial court was prejudiced against the defendant due to embarrassment resulting from this admonishment.

Any bias that might result from this court's comments, however, would not spring from an extrajudicial source. This court's rulings on, and comments concerning, various actions taken by the trial judge in the defendant's prior case are not extrajudicial in nature. They are part and parcel of the legal process and constitute an inherent component of the litigation concerning the defendant's prior case.

Moreover, the defendant has failed to establish that the trial judge held any actual bias or prejudice against him, regardless of source. As proof of bias, the defendant complains that the trial judge refused to sustain one of his objections at trial, imposed an excessive sentence, and excessive pending appeal. These are simply adverse rulings, and adverse rulings, without more, do not establish bias. *Alley*, 882 S.W.2d at 821. The defendant's claim that the trial judge erred by failing to grant his motion to recuse is denied.

**III.**

The defendant claims that the trial court erred by excluding as irrelevant certain evidence pertaining to his relationship with Ms. Connie Hope, including evidence that she had stalked and assaulted him – sometimes violently – on prior occasions. During a jury-out hearing held midway through his direct testimony, the defendant proffered evidence concerning a restraining order that he had taken out against Ms. Hope three days prior to the accident. The defendant also testified that he had experienced numerous difficulties trying to keep Ms. Hope away from him. He testified that the Polk County Sheriff's Office had once been called to his house because of a disturbance that Ms. Hope was causing on his property and that they had escorted her away after the incident. The defendant testified that Ms. Hope had been charged for assaulting him and for violating court orders by approaching him at various locations. The defendant testified that Ms. Hope had stabbed him with a knife on at least one occasion. The defendant testified that his problems with Ms. Hope continued after the accident. He testified that his family took out a restraining order against Ms. Hope while he was in the hospital and that additional warrants had been issued against Ms. Hope since the accident.

During and following this proffer, the defendant argued that his testimony on these

topics (as well as supporting documentation) should be admissible as relevant for purposes of showing that Ms. Hope was out of control and capable of causing the accident. The State initially informed the trial court that it had no objection to this evidence being presented to the jury, but it later reversed its position. The trial court ruled that the proffered evidence concerned a collateral domestic dispute between two people, had nothing to do with the case, and would be excluded.

Decisions concerning the relevance of evidence proffered for admission at trial are entrusted to the discretion of the trial court. *See State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). A trial court's exercise of discretion will not be reversed on appeal unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id.* (*quoting State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). The defendant has failed to establish that the trial court abused its discretion by refusing to admit the evidence at issue.

All relevant evidence is generally admissible unless a particular constitutional provision, statute, or rule excludes it. Tenn. R. Evid. 402. However, "[e]vidence which is not relevant is not admissible." *Id.* Evidence is not relevant unless it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Under these standards, the trial court did not reach an illogical conclusion when it decided that the evidence proffered by the defendant concerning Ms. Hope was irrelevant with respect to the particular charges against him.

The defendant argues that the excluded evidence "was critical to the defense, as it corroborated the difficulties [the defendant] had been having with Ms. Hope and supported his statements that she had been a contributing factor to the accident in question." However, the defendant was not charged with causing an accident. None of the charges against the defendant depend on his having contributed to an accident in any way. The defendant was charged with driving while under the influence and with driving on an expired license. The accident and its cause are of no legal significance; the only significance of the accident itself was that the defendant was found behind the wheel by law enforcement personnel afterward. Even if evidence existed that would conclusively prove that Ms. Hope had rammed the defendant's stationary car into oncoming traffic on the night in question and that she was the sole cause of the accident, this evidence would not render it any more or less likely that the defendant was behind the wheel of his vehicle when it was struck; render it any more or less likely that he had been drinking; or render it any more or less likely that his license was expired at the time. Consequently, the defendant's claim that the trial court erred by excluding his proffered testimony and evidence relating to Ms. Hope is denied.

## IV.

In his appellate brief, the defendant claims that "[t]he trial court erred when it denied defense counsel's motion to investigate jury dissatisfaction and reaction to the verdict reported in this cause." However, we can discern no error in the trial court's ruling with respect to any such motion filed by the defendant.

It is difficult to determine with certainty from a cold review of the record the precise purpose of, and relief sought by, the defendant's motion that was entitled "Motion for Leave to Allow Interview of Jurors" requesting the court "to allow interview of jurors in this cause to determine the validity or unanimity of the verdict returned and to determine whether the charge given to the jury by this Honorable Court had the effect, because it did not inform the jurors of the minimum mandatory sentences of depriving the defendant of a fair trial. . . ." Judged solely by this language, it would appear that the defendant simply sought to speak with jurors concerning their verdict. If so, no motion was necessary; a lawyer's right to converse in consensual fashion with jurors concerning their verdict following a trial is well established and has been acknowledged by our state supreme court in the Rules of Professional Conduct for decades. *See generally* Tenn. Sup. Ct. R. 8. While the precise wording of the governing rule has changed significantly over the years, the underlying principle has always been the same: attorneys may communicate with jurors after they have completed their service so long as the juror is willing to speak with them; the communication is not intended to vex, harass, embarrass or prejudice the juror; and the communication is not otherwise prohibited by law. *See, e.g.*, Tenn. Sup. Ct. R. 8, R P C 3.5(c) & (d) (2012); Tenn. Sup. Ct. R. 8, R P C 3.5 (c) & (d) (2010). Although local court rules may place some reasonable minor restrictions on the time, place, and manner of this communication, they may not place any additional restrictions on an attorney's right to informally interview jurors that work to contravene the attorney's right as established in Supreme Court Rule 8. *See, e.g., State v. Thomas,* 813 S.W.2d 395, 396-97 (Tenn. 1991) (holding unenforceable a local court rule that prohibited communication between lawyers and former jurors without prior court approval on grounds that the rule contravened Supreme Court Rule 8); *State v. James Webb*, No. 02C01-9512-CC-00383, 1997 Tenn. Crim. App. LEXIS 188, at *36 (Tenn. Crim. App. Feb. 27, 1997) ("[W]ithin the confines of [EC 7-29 and D.R. 7-108(d)] and Tenn. R. Evid. 606(b), the trial court may not prohibit post-trial contact between jurors and defense counsel."); *State v. David A McCarter and Penny Lou Kennon*, C.C.A. No. 1296, 1990 Tenn. Crim. App. LEXIS 739, at *5 (Tenn. Crim. App. Nov. 1, 1990) ("The refusal of the trial court judge to allow the attorneys to talk with citizens who sat as jurors in this case is clearly erroneous."). Consequently, assuming that defense counsel was not engaging in any activities that might serve to harass, embarrass, or prejudice the former jurors, he had a right

to attempt to speak with them and did not need to seek the trial court's permission to do so.[2] A motion for leave to informally interview jurors need only be filed if there is some reasonable concern that "the contemplated inquiry reasonably could be considered to go beyond that approved by the provisions of Rule 8." *Thomas*, 813 S.W.2d at 397.

However, concern relating to a desire to informally interview jurors is not the gravamen of the defendant's claim. After reviewing the transcripts of the proceedings below and the contents of the appellate briefs, it appears that the dispute between the parties does not revolve around any need to "interview" the former jurors in the sense of speaking with them off the record. Indeed, it appears from the record that either defense counsel or someone else associated with the defense had already spoken with at least one of the defendant's former jurors because defense counsel produced an affidavit from that juror seeking to change his vote at the defendant's sentencing hearing. Thus, the dispute between the parties appears to center around the defendant's desire to take and present testimony from the jurors. For example, in the court below, in response to a question from the trial court concerning whether the defendant wished to present any witnesses concerning his pending motion, defense counsel expressed concern that the jurors "ought to have independent counsel before they choose to do that" and explained that he did not want to "just jerk them up on the stand." This discussion plainly contemplates that defense counsel sought to have a least one former juror testify pursuant to his "Motion for Leave to Allow Interview of Jurors."

Moreover, on appeal, the parties' arguments center almost entirely around the applicability of Tennessee Rule of Evidence 606(b), which governs the taking of testimony of former jurors, not informal interviews. More specifically, the defendant claims on appeal that the record reflects the possible existence of extraneous information or improper influence upon the jury and that he should have been permitted to explore this possibility consistent with the rules of evidence. The State responds that neither (1) the jury's questions to the court during its deliberations nor (2) the affidavit that was subsequently filed by a juror seeking to change his vote provide any basis for concluding that the jury may have been

---

[2] After hearing the defendant's argument concerning his motion for leave to interview jurors and to set aside the verdict, the trial court stated, "Nobody in this courtroom had better be talking to this juror again," "[t]here shall be, and that's a 'shall,' not a 'may,' there shall be no contact with [a specific juror] until the conclusion of this year," and "if there is any contact with [the specified juror] it will be a violation of the Court's order." Such an order would be clearly erroneous absent some finding by the court that the lawyer had engaged or would engage in conduct that violated the ethical constraints placed on a lawyer's ability to speak with former jurors by our supreme court. While the trial court stated that this juror was "still in the pool," and therefore could not be contacted, the court did not explain on the record how contact from defense counsel had violated or was likely to violate Supreme Court Rule 8. Reasons that may have been self-evident to the court below are not so evident in the appellate record.

subject to extraneous information, and testimony by former jurors concerning other subjects is forbidden by Rule 606(b).

Both a trial court's denial of a motion to hold a hearing concerning a jury's possible exposure to extraneous information and a trial court's decision to permit the taking of the testimony of any or all of the former jurors at such a hearing are reviewed under an abuse of discretion standard. *See State v. King,* 40 S.W.3d 442 (Tenn. 2001) ("In general, the course and conduct of trial proceedings rests within the sound discretion of the trial court."); *State v. Donald R. Eady, Jr.*, No. E2000-01152-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 928, at *41 (Tenn. Crim. App. Dec. 4, 2001) (explaining that trial courts have "wide discretion as to the proceedings before [them]" and that the manner in which the trial court conducted a hearing concerning allegations of jury exposure to extraneous information "was not an abuse of its discretion"); c*f. State v. Clayton*, 131 S.W.3d 475, 478-79 (Tenn. Crim. App. 2003) (holding that a trial court's decisions concerning the method to be used for polling a jury after announcing a verdict and for determining whether a juror has given an unequivocal response to such a poll are reviewed under an abuse of discretion standard). The defendant has failed to establish that the trial court abused its discretion when it failed to hold a hearing, take testimony, or otherwise further officially investigate the defendant's allegations.

Both the Sixth Amendment of the United States Constitution and Article I, section 9 of the Tennessee Constitution guarantee a defendant's right to an impartial jury. An impartial jury is one in which the jurors are "free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting *Toombs v. State*, 197 Tenn. 229, 270 S.W.2d 649, 650 (Tenn. 1954)). However, "[t]he right to impeach a jury verdict is extremely limited." *Carruthers v. State*, 145 S.W.3d 85, 93 (Tenn. Crim. App. 2003). Inquiry into a jury's deliberative process is limited by Tennessee Rule of Evidence 606(b), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. Rule 606. "The public policy considerations behind Rule 606(b) are obvious [and] include the prevention of jury harassment, encouragement of free and open jury deliberation, promotion of finality of verdicts, and the reduction of the incentive for jury tampering." *Carruthers*, 145 S.W.3d at 92-93. Consequently, unless the testimony would fall within one of the three specified exceptions, "a juror is not permitted to testify about anything occurring during deliberations, including the juror's own internal thoughts, motivations, or emotions." *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005).

The defendant carries the burden of establishing that a juror bias challenge may be maintained and of establishing a *prima facie* case of bias. *See State v. Robinson*, 146 S.W.3d 469, 523 (Tenn. 2004); *Atkins*, 867 S.W.2d at 355. Here, the material produced by the defendant was insufficient to provide a basis for bringing a juror bias claim. Using the investigative tools available to him, the defendant produced an affidavit from a former juror concerning the jury's deliberations, which he claims provides a basis for suspecting that the jury was subjected to extraneous information when it is considered in conjunction with a question asked by the jury during its deliberations. However, neither the affidavit nor the jury's question, without more, provides any grounds for establishing bias.

The affidavit produced by the defendant primarily deals with a former juror's complaint that the defendant was punished excessively (in the juror's view) for his crime. The affidavit discusses the juror's personal thoughts on the case, explains that many members of the jury were tired during deliberations, and complains that they were given insufficient information concerning the consequences of a conviction. The testimony contained in this affidavit discusses the jury's deliberative process but does not fall within any of the exceptions provided by Rule 606(b). At heart, the juror merely claims that he was confused by a jury instruction and erroneously believed that the defendant would receive only a fine if convicted. There is nothing to suggest that this misunderstanding was the result of any outside influence. Nothing in the affidavit insinuates that the jury received extraneous prejudicial information, that any outside influence was improperly brought to bear on the jury, or that the jurors themselves agreed to be bound in advance by a quotient. Consequently, Rule 606(b) prohibited the trial judge from considering the affidavit as evidence of juror bias or as a possible grounds for impeaching the jury's verdict.

Because the trial judge was prohibited by Rule 606(b) from considering the affidavit in its entirety, the defendant's argument that the affidavit should be considered in the context of the questions asked by the jury during its deliberations is also insufficient to establish a basis for impeaching the jury's verdict. It is true that one of the questions asked by the jury – inquiring as to whether any bias might arise from a juror having allegedly stated "if you had

known David Gaddis you'd know he always gets a designated driver" – might imply that at least one juror was aware of the defendant's reputation within the community.[3] However, although notions of "extraneous information" may encompass "a juror's personal knowledge of the defendant's prior criminal record or arrest," *State v. Kendrick D. Rivers*, No. W2006-01120-CCA-R3-CD, 2008 Tenn. Crim. App. LEXIS 7, at *8 (Tenn. Crim. App. Jan. 7, 2008) (citing NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 606.2 (3rd ed. 1995)), we are unwilling to extend that principle so far as to encompass a juror's personal knowledge of a defendant's general reputation in the community, especially in absence of any allegation that the juror concealed the information during *voir dire*. If "mere exposure to news accounts of [an] incident [is] insufficient to establish bias," and "jurors can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury,"*State v. Thomas D. Huskey*, No. E1999-00438-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 550, at *312-13 (Tenn. Crim. App. June 28, 2002), then a mere allegation that a juror may have possessed prior awareness of the defendant's general reputation in the community, without more, is insufficient to provide a basis for maintaining a juror bias challenge.

Furthermore, we agree with the trial court that the defendant would have had a difficult time establishing prejudice given the precise content of the question posed by the jury. To the extent that the question reveals any potential juror bias, this bias appears to have been strongly favorable to the defendant. The fact that the defendant was convicted nonetheless would appear to conclusively establish that any extraneous information to which the jury might have been exposed had no effect on its verdict. The defendant's claim is denied.

## V.

The defendant's final claim falls under a heading stating that the "trial court erred when it enhanced the sentence imposed on him as a result of the convictions in the present case." However, the text and body of the argument contained within that section make clear that the defendant is simply challenging the sentence imposed by the trial court as excessive.

---

[3] The implication that some juror might have known the defendant – by reputation, at least – before the trial also raises the specter of the possibility that a juror may have concealed information during *voir dire*, a fact which, if established, would raise a presumption of prejudice. *Atkins*, 867 S.W.2d at 355 ("When a juror willfully conceals (or fails to disclose) information on *voir dire* which reflects on the juror's lack of impartiality, a presumption of prejudice arises."). However, the defendant has not argued, either in this court or the court below, that any information was improperly withheld by any juror during *voir dire*. Furthermore, no transcript of the *voir dire* has been included in the appellate record. Consequently, any claim that the defendant might have had to have been entitled to further investigation of the jury verdict based on this issue has been waived. *See* Tenn. Ct. Crim. App. R. 10(b).

Within that general rubric, the defendant takes particular issue with the trial court's reliance on a prior DUI conviction (for an act committed after the events at issue in this case) in order to reach the conclusion that the defendant had a serious alcohol problem and that punishment for his prior crimes had failed to provide him with sufficient incentive to acknowledge and address this problem. However, the defendant has failed to carry his burden of demonstrating that his sentence was improper.

The burden of demonstrating that a sentence is erroneous is placed upon the appealing party. *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). We review a trial court's sentence *de novo*, but with a presumption that any factual determinations made by the trial court are correct. *Id.* This presumption "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *Id.* at 344-45 (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails" and we review the defendant's sentence using a pure *de novo* standard. *Id.* at 345.

Sentencing courts are afforded traditional flexibility and discretion when sentencing for misdemeanors. *State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). However, any sentence imposed by a trial court must be in accordance with the overall principles, purpose, and goals of the Criminal Sentencing Reform Act of 1989. *State v. Palmer*, 902 S.W.3d 391, 393 (Tenn. 1995). Just as with felony sentences, if a court has "followed the appropriate statutory procedure and imposed a lawful sentence after giving due consideration and proper weight to the factors and principles under law, and so long as the sentencing court's findings of facts are adequately supported by the record, then this Court may not modify the sentence, even if actually preferring a different result." *State v. Goodwin*, 143 S.W.3d 771, 784 (Tenn. 2004).

In Tennessee Code Annotated section 55-10-403(a), the legislature proscribed specific penalties for a defendant's second conviction for driving under the influence:

> For conviction on the second offense, there shall be imposed a fine of not less than six hundred dollars ($600) nor more than three thousand five hundred dollars ($3,500), and the person or persons shall be confined in the county jail or workhouse for not less than forty-five (45) days nor more than eleven (11) months and twenty-nine (29) days, and the court shall prohibit the convicted person or persons from driving a vehicle in this state for a period of time of two (2) years. Upon the conviction of a person on the second offense only, a judge may sentence the person to participate in a court approved alcohol or drug treatment program.

-19-

T.C.A. § 55-10-403(a)(i)(A)(iv) (2005). When read in conjunction with section 55-10-403(c), which provides: "All persons sentenced under subsection (a) shall, in addition to service of at least the minimum sentence, be required to serve the difference between the time actually served and the maximum sentence on probation," the relevant DUI provisions create a specific sentence for all misdemeanor DUI convictions of eleven months and twenty-nine days, "with the only function of the trial court being to determine what period above the minimum period of incarceration established by statute, if any, is to be suspended." *State v. Combs*, 945 S.W.2d 770, 774 (Tenn. Crim. App. 1996). "[A] DUI offender can be sentenced to serve the entire eleven month and twenty-nine day sentence imposed as the maximum punishment for DUI so long as the imposition of that sentence is in accordance with the principles and purposes of the Criminal Sentencing Reform Act of 1989." *Palmer*, 902 S.W.2d at 394.

The trial court ordered the defendant to serve seven months in confinement, well above the statutory minimum of forty-five days, on the grounds that: (1) some additional confinement was necessary to protect society from a defendant with a long criminal history, (2) some additional confinement was necessary to avoid depreciating the seriousness of the defendant's offense, and (3) measures less restrictive than confinement had been tried without success. In this regard, the trial court did not err. This was not a run-of-the-mill DUI case. The defendant's blood alcohol content was extremely high. Moreover, he was involved in a serious accident that almost cost him his life and put two other lives in great peril. Regardless of whether the defendant actually caused the accident, his drinking and driving certainly did not reduce the degree of danger he posed to himself and others behind the wheel. Moreover, the defendant's criminal history includes repeated acts of driving while intoxicated – acts occurring both before and after the accident in this case and his resulting hospitalization. Regardless of whether the trial court was correct in concluding that the defendant was in denial about a serious drinking problem, the trial court's conclusions concerning the seriousness of the defendant's offense, the danger that he posed to society, and his failure to respond to lesser forms of punishment is well supported by the record. The defendant's challenge to the trial court's decision to order him to serve seven months of his sentence in incarceration is therefore denied.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-20-